# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| EMIGRANT RESIDENTIAL LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 19-cv-12258-DJC |
| | ) | |
| LINDA S. PINTI, LESLEY R. PHILLIPS, and any and all occupants, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                    **December 18, 2023**

## I.      Introduction

Plaintiff Emigrant Residential LLC ("Emigrant") has sued Defendants Linda S. Pinti ("Pinti"), Lesley R. Phillips ("Phillips") and any and all occupants of a property located at 1643 Cambridge Street #52, Cambridge, MA ("the Property") (collectively, "Defendants") seeking a declaratory judgment to strike the discharge of mortgage from title of the Property.  D. 1. Defendants counterclaimed that Emigrant perpetrated fraud on the Court, engaged in unfair and deceptive business practices in violation of Mass. Gen. L. c. 93A, and intentionally and negligently inflicted emotional distress.  D. 20.  After remand from the First Circuit, allowing Defendants additional discovery in two areas and permitting the parties to supplement their briefing, the Court ALLOWS the motion for summary judgment, D. 28, filed by Emigrant on its claims and Defendants' counterclaims for the reasons stated below.

1

## II.      Standard of Review

The Court grants summary judgment where there is no genuine dispute regarding any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A material fact is one that "carries with it the potential to affect the outcome of the suit under the applicable law."  García-González v. Puig-Morales, 761 F.3d 81, 87 (1st Cir. 2014) (quoting Newman v. Advanced Tech. Innovation Corp., 749 F.3d 33, 36 (1st Cir. 2014)) (internal quotation mark omitted).  The moving party "bears the burden of demonstrating the absence of a genuine issue of material fact."  Rosciti v. Ins. Co. of Pa., 659 F.3d 92, 96 (1st Cir. 2011) (citation omitted).  Once that burden is met, the non-moving party may not rest on the allegations or denials in its pleadings.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986) (citation omitted).  Instead, "with respect to each issue on which [it] would bear the burden of proof at trial," the non-moving party must "demonstrate that a trier of fact could reasonably resolve that issue in [his] favor."  Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010) (citations omitted).  The Court views the record in the light most favorable to the non-moving party, "drawing reasonable inferences" in its favor.  Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009) (citation omitted).  "Conclusory allegations, improbable inferences, and unsupported speculation," however, are "insufficient to establish a genuine dispute of fact."  Travers v. Flight Servs. & Sys., Inc., 737 F.3d 144, 146 (1st Cir. 2013) (citation and internal quotation marks omitted).

## III.     Factual Background

The following facts, which are undisputed unless otherwise noted, are drawn from Emigrant's statement of material facts, D. 30, Defendants' response to the same and Defendants' statement of additional material facts, D. 45-5, Emigrant's response thereto, D. 47, Defendants'

supplemental response and statement of facts, D. 111, Emigrant's response to the supplemental statement of facts, D. 117, and the exhibits referenced in these documents.

### A.  <u>Default of Pinti Mortgage and Note</u>

Pinti and Phillips have lived in the Property since the 1980s.  D. 117 ¶¶ 67–68.  On March 13, 2008, Pinti and Phillips executed and delivered a promissory note to Emigrant Mortgage Company, Inc. ("EMC") for $160,000.00 ("Pinti Note") as part of refinancing a home equity loan. D. 45-5 ¶ 1; D. 117 ¶ 69.  On that same date, Pinti and Phillips provided a mortgage ("Pinti Mortgage") on the Property to EMC to secure the Pinti Note and recorded it with the Middlesex County (Southern District) Registry of Deeds.  D. 45-5 ¶ 3; D. 117 ¶ 69.

Roughly eighteen months later, on August 1, 2009, Defendants defaulted on the Pinti Note by failing to make payment and failed to make all subsequent payments thereafter.  D. 45-5 ¶ 4; D. 117 ¶ 71.  EMC sent Defendants a 90-day notice of right to cure on September 29, 2009.  D. 45-5 ¶ 5; <u>see</u> D. 31-1 at 31.

### B.  <u>Relationship Between EMC, ESB-MH, Emigrant, and FHLBNY</u>

On November 30, 2009, EMC assigned the Pinti Mortgage to ESB-MH Holdings, LLC ("ESB-MH") and recorded it with the Middlesex County (Southern District) Registry of Deeds on September 30, 2019 ("ESB-MH Assignment").  D. 45-5 ¶ 6; D. 117 ¶ 75.  Plaintiff Emigrant is the successor-by-merger to ESB-MH.  D. 45-5 ¶ 7; D. 117 ¶ 76; <u>see</u> D. 31-1 at 36–39.  On the same day as the ESB-MH Assignment, ESB-MH executed an assignment of the Pinti Mortgage to Federal Home Loan Bank of New York ("FHLBNY"), but did not immediately deliver the assignment to FHLBNY ("FHLBNY Assignment").  D. 45-5 ¶¶ 8–9; D. 117 ¶ 77.

As to FHLBNY's relationship with the various Emigrant entities, the Court notes the following.  Emigrant Savings Bank ("Emigrant Bank") is the parent of Emigrant.  D. 117 ¶ 78.  On

December 1999, FHLBNY and Emigrant Bank entered into the Advances, Collateral Pledge and Security Agreement ("Advances Agreement").  D. 117 ¶ 79.  The Advances Agreement provides that as security for loans that FHLBNY may advance to Emigrant Bank, Emigrant Bank "hereby assigns, transfers, and pledges to [FHLBNY], and grants to [FHLBNY] a security interest in all of the Capital Stock, Mortgage Collateral, Securities Collateral and Other Collateral."  D. 117 ¶ 80; see D. 112-3 at 5.  Mortgage Collateral is defined to include "first mortgages and deeds of trust . . . and all notes, bonds or other instruments evidencing loans secured thereby."  D. 117 ¶¶ 80–81; D. 112-3 at 3.  The Advances Agreement gives FHLBNY certain rights over the Mortgage Collateral and Emigrant Bank certain responsibilities regarding maintenance of the collateral.  D. 117 ¶¶ 82–88; D. 112-3 at 5–9, 11.

On April 7, 2008, roughly a month after the Pinti Note and Mortgage were executed, ESB-MH, Emigrant Bank and FHLBNY executed the Subsidiary/Affiliate Collateral Pledge and Security Agreement ("Pledge Agreement").  D. 117 ¶ 89.  The Pledge Agreement acted as an extension of the Advances Agreement, wherein ESB-MH, as an affiliate of Emigrant Bank, agreed to "pledge certain of its property as collateral to" FHLBNY.  D. 112-5 at 2; D. 117 ¶ 91. Under the Pledge Agreement, ESB-MH "hereby assign[ed], transfer[ed] and pledge[d] to [FHLBNY], and grant[ed] to [FHLBNY] a security interest in, those certain instruments (and the related mortgages), securities and other property which are: (i) specifically listed and identified in Attachment 'A' hereto." D. 112-5 at 2–3; see D. 117 ¶ 90.  The Pledge Agreement further provided that Attachment A could be substituted from time to time and, much like the Advances Agreement, set forth FHLBNY's rights and ESB-MH's responsibilities with regard to the collateral pledged. D. 112-5 at 3–6; see D. 117 ¶ 92.

4

In a letter dated August 4, 2009, FHLBNY informed Emigrant Bank that it had "moved Emigrant [Bank] to the Listing & Segregation II collateral category for all its mortgage collateral" ("Category Change Letter"). Id. ¶¶ 97–98; D. 112-9 at 2. The letter indicated that "the process is to be completed within ninety days or Friday, October 30, 2009." D. 117 ¶ 98; D. 112-9 at 2. The Listing & Segregation II collateral category imposed (on Emigrant Bank and its subsidiaries, including ESB-MH) certain requirements for maintaining collateral as outlined in the Delivery of Mortgage Collateral Procedures document ("Delivery Procedures"), D. 112-9 at 2, 4–25, and FHLBNY's Member Products Guide ("Products Guide"), D. 112-10; D. 118-1 at 101–10. D. 117 ¶¶ 99–100. These requirements included endorsing promissory notes in blank and preparing individual mortgage assignments to FHLBNY in recordable form. D. 117 ¶ 101; see 112-9 at 5–6; D. 112-10 at 4–5. ESB-MH was also required to stamp loan files as assigned to FHLBNY and maintain said files in a segregated vault or storage area marked "Federal Home Loan Bank of New York." D. 117 ¶¶ 102–103.

As of August 2009, Emigrant Bank was borrowing money from FHLBNY and ESB-MH intended to comply with these obligations. D. 117 ¶ 104. Between November 2009 and January 2010, "ESB-MH prepared mortgage assignments and note allonges for Mortgage Collateral pledged or to be pledged as security for loans from FHLBNY." Id. ¶ 106. Emigrant disputes, however, that as of November 2009 ESB-MH was still pledging mortgage loans as collateral and asserts that it had elected to pledge securities instead. Id. ¶¶ 80, 82–88, 90–93, 95–103, 105, 109. Setting aside whether Pinti Note and Mortgage were already pledged, intended to be pledged, or simply swept into a larger project wherein even loans that did not qualify as collateral under the Products Guide were prepared, see id. ¶¶ 106–07, 110–11; D. 112-4 at 11, it is undisputed that

ESB-MH endorsed the Pinti Note in blank and executed the FHLBNY Assignment on November 30, 2009.  Id. ¶ 107.

### C.    **Attempted Foreclosure Sale on the Property**

Defendants failed to cure their default by December 28, 2009, the expiration date of the 90-day notice of right to cure, and EMC initiated foreclosure proceedings on the Property.  D. 45-5 ¶ 10; D. 117 ¶ 113.  Pinti filed for Chapter 7 bankruptcy and obtained a discharge on February 4, 2011.  D. 45-5 ¶ 11–12; D. 117 ¶ 114.  On August 22, 2011, EMC served a written response ("QWR Response") to a qualified written request from the Defendants seeking information pertaining to the ownership of the Pinti Mortgage pursuant to 12 U.S.C. § 2605(e).  D. 45-5 ¶ 13; D. 117 ¶ 115.  The QWR Response named ESB-MH as the owner of the loan and EMC as the servicer of the loan and further explained that the ESB-MH Assignment was not recorded.  D. 117 ¶ 116; see D. 31-1 at 42.   It also stated that the Pinti Note, Pinti Mortgage, ESB-MH Assignment were in the possession of EMC.  D. 117 ¶ 116; see D. 31-1 at 42.  About a year later, on August 9, 2012, EMC sold the Property to Harold Wilion ("Wilion") for $260,000 and recorded the foreclosure deed with the Middlesex County (Southern District) Registry of Deeds.  D. 45-5 ¶¶ 14-16; 19; D. 117 ¶ 118.

EMC's assistant treasurer, Joel Marcano ("Marcano") attests that under "EMC's established loan servicing policies and procedures" when EMC receives foreclosure sale proceeds from a third-party purchaser following a foreclosure sale, EMC's loan servicing department prepares a memorandum to EMC's loan payoff department.  D. 31 ¶ 18.  The memorandum states the amount of the funds received, confirms that the funds were received following a foreclosure sale to a third party and instructs that the loan payoff department should not prepare a discharge of mortgage.  Id.  Marcano also attests that neither EMC nor Emigrant has ever had a policy of

6

providing a discharge of mortgage to a borrower upon receiving proceeds from a third-party purchaser following a foreclosure.  Id. ¶ 19.

On September 18, 2012, Anna Sorvillo, an EMC employee at the time, prepared a memorandum for another EMC employee, Juan Minier ("Minier") attaching the $260,000.00 check from the Wilion foreclosure sale and identifying said check as "the amount of a Third Party Sale to payoff this loan" ("Payoff Memo").  D. 31-1 at 94; see D. 117 ¶ 119.   The memorandum did not state that the funds were received following a foreclosure on the Property nor did it discuss whether Minier should prepare a discharge of the Pinti Mortgage.  D. 31-1 at 94.  Nonetheless, on October 3, 2012, EMC prepared a discharge of the Pinti Mortgage ("Discharge") and sent it to Defendants for recording.  D. 117 ¶ 120; see D. 31-1 at 99–100.  Marcano attests that EMC staff prepared the Discharge by mistake as a result of the Payoff Memo's "fail[ure] to properly inform Minier that a Discharge of Mortgage should not be prepared" and "a misunderstanding . . . as to how the foreclosure sale proceeds were to be applied to the Pinti Mortgage Loan."  D. 31 ¶¶ 25–27.   Neither EMC nor Emigrant have returned the Pinti Note, cancelled or otherwise, to Defendants.  Id. ¶ 28, D. 45-5 ¶ 28.

**D.    Pinti I**

On October 29, 2012, Wilion filed a summary process action in state court against the Defendants for possession of the Property.  D. 45-5 ¶ 30; D. 117 ¶ 122.  In response, Defendants filed a separate litigation in state court against Wilion and EMC, challenging the foreclosure sale.  D. 45-5 ¶ 31.  On November 7, 2013, the state court found in favor of Wilion and EMC and the case was appealed.  Id. ¶¶ 32–34; D. 117 ¶¶ 123–24.  During the pendency of the state court litigation, Defendants made monthly $2000 use and occupancy payments to Wilion, part of which were used to satisfy condo fees, and have since continued to pay condo fees.  D. 117 ¶ 129–30.

On July 17, 2015, the Massachusetts Supreme Judicial Court ("SJC") ruled that the foreclosure sale was void because EMC's notice of right to cure failed to strictly comply with the notice provisions set forth in the Pinti Mortgage.  D. 45-5 ¶¶ 34-35; D. 117 ¶ 124–125; Pinti v. Emigrant Mortg. Co., Inc., 472 Mass. 226, 233–38 (2015) ("Pinti I").  In light of this decision, Emigrant returned the foreclosure sale proceeds to Wilion.  D. 45-5 ¶ 39; D. 117 ¶ 126.  Since Pinti I, EMC paid bi-annual real estate taxes to the City of Cambridge.  D. 45-5 ¶ 41.

Within a few days of the Pinti I decision, Pinti discovered the Discharge within an envelope that she had previously overlooked.  D. 45-3 ¶ 16.  On July 29, 2015, two weeks after Pinti I, Pinti recorded the Discharge with the Middlesex County (Southern District) Registry of Deeds.  D. 45-5 ¶ 38; D. 117 ¶ 127.  Defendants, however, have not exercised their right of redemption in the Property by satisfying the total debt owed under the terms of the loan.  D. 45-5 ¶ 42.  On or about December 30, 2015, EMC sent the original Pinti Note and the originally recorded Pinti Mortgage to Emigrant's counsel.  D. 32 ¶ 14.

### E.    Pinti II

On June 17, 2016, EMC sued Defendants in another session of this Court (Wolf, J.) seeking, *inter alia*, a declaratory judgment striking the Discharge from title to the Property.  D. 45-5 ¶ 46; D. 117 ¶ 131; see Emigrant Mortg. Co., Inc. v. Pinti, 16-cv-11136-MLW (D. Mass. Jan. 17, 2019) ("Pinti II").  Defendants asserted counterclaims, seeking a declaratory judgment that Defendants owned the Property free of any mortgage, as well as a claim for negligent infliction of emotional distress.  Pinti II, D. 30.  EMC moved for summary judgment on its claim and Defendants' counterclaims.  D. 117 ¶ 133; Pinti II, D. 35.  The Court allowed EMC's motion with respect to Defendants' counterclaim for negligent infliction of emotional distress, but otherwise denied it without prejudice.  D. 117 ¶ 134; Pinti II, D. 54.  After a bench trial, D. 117 ¶ 135; see

8

<u>Pinti II</u>, D. 105, 108, 112-13, the Court (Wolf, J.) dismissed the case "because plaintiff [EMC] lacks standing."  D. 117 ¶ 136; <u>Pinti II</u>, D. 109.  In <u>Pinti II</u>, the Defendants argued that EMC was not the mortgagee on August 9, 2012 because the Pinti Mortgage had been assigned to ESB-MH. <u>Pinti II</u>, D. 45 at 19–20.  The Court agreed, ruling that EMC was not the mortgagee of the loan in August 2012 because the Pinti Note had been previously assigned to ESB-MH and that ESB-MH did not reassign it to EMC.  D. 117 ¶ 137; <u>Pinti II</u>, D. 110 at 5-6, 8.  Thus, the Court dismissed EMC's action without prejudice, holding that "ESB-MH was the mortgagee on August 9, 2012. EMC was not the proper entity to attempt to foreclose by entry."  D. 45-5 ¶ 60; <u>Pinti II</u>, D. 110 at 17, 20.

EMC moved for reconsideration of the Court's order dismissing its claim to strike the Discharge, arguing that it is the real party in interest under a subservicing agreement that authorized it to commence proceedings on behalf of ESB-MH and required Emigrant to indemnify ESB-MH for certain losses.  D. 45-5 ¶ 61; D. 117 ¶ 138; <u>Pinti II</u>, D. 115-16.  The Court denied the motion because EMC had not raised this argument at trial.  D. 117 ¶ 139; <u>Pinti II</u>, D. 121 at 4, 7. The Court, moreover, stated that the holder of the Pinti Note could seek to strike the allegedly mistaken discharge of the Pinti Mortgage.  <u>Pinti II</u>, D. 121 at 7; <u>see</u> D. 117 ¶ 140.

### F.    Post Pinti-II Emigrant Assignment

After the Court's ruling in <u>Pinti II</u>, Emigrant reached out to FHLBNY in an effort to address issues raised regarding FHLBNY Assignment.  D. 117 ¶¶ 142, 143.  On June 24, 2019, FHLBNY executed and emailed to Emigrant an assignment of the Pinti Mortgage back to Emigrant ("Emigrant Assignment").  D. 117 ¶ 144.  On September 30, 2019, Emigrant recorded both the 2009 and FHLBNY Assignment in the Middlesex County (Southern District) Registry of Deeds. <u>Id.</u> ¶¶ 146–47.

During this time, FHLBNY and Emigrant also negotiated the language of a letter expressing FHLBNY's position as to assignments that were prepared by ESB-MH in 2009. Id. ¶¶ 143, 145. On January 15, 2020, FHLBNY sent a letter to Emigrant stating that "[o]n the date of this letter . . . the signed Assignments of Mortgage for the Subject Loans, naming FHLBNY a assignee are null and void." D. 112-17 at 3. The loan number for the Pinti Mortgage is listed as one of the Subject Loans. Id. at 8; see D. 112-4 at 36.

## IV.   Procedural History

Emigrant filed its complaint in this case on November 4, 2019. D. 1. After the Court denied Defendants' motion to dismiss, D. 13, Defendants filed an answer with counterclaims against Emigrant. D. 20. Emigrant moved for summary judgment on its declaratory judgment claim and Defendants' counterclaims. D. 28. In response, Defendants moved for discovery under Fed. R. Civ. P. 56(d), D. 35, which this Court denied. D. 43. On March 24, 2021, this Court allowed Emigrant's motion for summary judgment. D. 61. On Defendants' appeal, the First Circuit affirmed in part and reversed in part this Court's decision on the motion for discovery, vacated the order allowing the motion for summary judgment and remanded the case for limited discovery regarding "the chain of custody and authenticity of the Note" and "the 2019 assignments" and supplemental briefing. D. 85. On remand, the parties have engaged in discovery and submitted supplemental briefs. D. 110; D. 116. The Court heard the parties on the summary judgment motion and took the matter under advisement. D. 119.

## V.   Discussion

The First Circuit vacated this Court's prior order on Emigrant's motion for summary judgment, D. 61, without examining the merits of the parties' claims. D. 84 at 11. Where the parties' supplemental briefs do not raise new arguments or present new evidence relating to certain

issues, the Court's analysis is largely unchanged.  As to new arguments and evidence, however, the Court has considered the discovery and supplemental briefing.  As to all issues, this Court has decided the summary judgment motion, D. 28, anew.

### A.        Emigrant's Claim Is Not Barred by *Res Judicata*

Defendants argue that Emigrant's claim is barred by the doctrine of *res judicata* because in <u>Pinti II</u>, EMC "failed to bring up the fact that they had standing to challenge the discharge as the servicer under the mortgage." D. 45-1 at 3.  Defendants further assert that EMC's failure "forever waived their rights to reinstate the mortgage." <u>Id.</u>  A claim is precluded under *res judicata* if there is "(1) a final judgment on the merits in an earlier action; (2) sufficient identity between the causes of action asserted in the earlier and later suits; and (3) sufficient identity between the parties in the two suits." <u>Bay State HMO Mgmt., Inc. v. Tingley Sys., Inc.</u>, 181 F.3d 174, 177 (1st Cir. 1999).

Defendants' argument fails on the first prong because there was no final judgment on the merits in an earlier action.  The Court in <u>Pinti II</u> dismissed EMC's claim because EMC lacked standing. <u>Pinti II</u>, D. 109.  "The standing inquiry does not focus on the merits of the dispute.  It focuses only on whether the litigant is entitled to have the court decide the merits of the dispute." <u>City of Hope Nat. Med. Ctr. V. HealthPlus, Inc.</u>, 156 F.3d 223, 228 (1st Cir. 1998) (internal quotation marks omitted) (quoting <u>Warth v. Seldin</u>, 422 U.S. 490, 498 (1975)).  Given that the Court did not reach the merits, Emigrant's claims are not barred by *res judicata*. <u>See</u> <u>McCarney v. Ford Motor Co.</u>, 657 F.2d 230, 234 (8th Cir. 1981) (ruling that "a dismissal based upon a lack of standing is not 'on the merits' of the underlying substantive claim and is not a bar to asserting another theory of relief based upon the same operative facts assuming the other elements of claim preclusion are satisfied").

11

This is particularly true here where the Court in <u>Pinti II</u>, dismissed EMC's claims without prejudice.  <u>See O'Connell v. Gross</u>, No. 19-11654-FDS, 2020 WL 1821832, at *4 n.3 (D. Mass. Apr. 10, 2020) (noting that even if prior court had reached substantive issues, claim preclusion was not applicable where prior complaint was dismissed without prejudice).  In fact, the Court in <u>Pinti II</u> expressly stated that its decision was not a final adjudication on the issue, noting that "a new case can be filed by the party or parties with standing to contest the discharge of the mortgage. It is likely that another case will be filed by the noteholder to foreclose.  It appears that the noteholder—or if [EMC] has standing, the noteholder and [EMC]—could in that case, or another, again seek to strike the allegedly mistaken discharge of the mortgage." <u>Pinti II</u>, D. 121 at 7. Accordingly, the Court concludes that Emigrant's claims are not barred by *res judicata* because <u>Pinti II</u> does not constitute a final adjudication on the merits.

### B.      <u>Emigrant Has Established Standing to Strike the Discharge of Mortgage</u>

The term "mortgagee" refers to a person or entity holding the mortgage and either holding the mortgage note or acting on behalf of the note holder.  <u>Eaton v. Fed. Nat'l Mortg. Ass'n</u>, 462 Mass. 569, 571 (2012).  The mortgagee is entitled to foreclose on the secured property in the event of default.  <u>Id.</u> at 579–80.  Before initiating a foreclosure, however, the mortgagee must hold the mortgage pursuant to a valid written assignment and be able to provide proof of such.  <u>See</u> <u>U.S. Bank Nat'l Ass'n v. Ibanez</u>, 458 Mass. 637, 649–53 (2011).

In their supplemental brief, Defendants assert that Emigrant lacks standing to bring this action because Emigrant is not the mortgagee.  D. 110 at 2.  In short, Defendants argue that ESB-MH transferred the Pinti Note and Pinti Mortgage to the FHLBNY sometime in 2008 or 2009 and that any transfer back to Emigrant in 2019 was void because the Pinti Mortgage had been discharged.  <u>Id.</u>  Emigrant replies that it need only establish that it is the holder of the Pinti Note,

because it seeks to strike the Discharge, rather than foreclose.  D. 116 at 10 (citing Pinti II, D. 121 at 7).  Emigrant further argues that even if the Pinti Mortgage had been delivered to FHLBNY in 2009, FHLBNY assigned the Pinti Mortgage back to Emigrant in 2019.  Id. at 2.

The Court begins with the ownership of the Pinti Note.  Defendants originally executed the Pinti Note in favor of EMC on March 13, 2008 alongside the Pinti Mortgage.  D. 31-1 at 1.  On November 30, 2009, the Pinti Note was then endorsed by EMC in favor of ESB-MH.  D. 31-1 at 7; D. 45-2 at 217–18; see Pinti II, D. 110 at 6, 14 (concluding that ESB-MH was the owner of the Pinti Note as of November 30, 2009).  Emigrant merged with ESB-MH in March 2013.  D. 31-1 at 36–39.

Defendants assert that sometime in 2008 or 2009 prior to the Emigrant and ESB-MH merger, ESB-MH transferred ownership of the Pinti Note (and assigned the Pinti Mortgage) to FHLBNY under the terms of the Advances Agreement and the Pledge Agreement.  D. 110 at 4.  As an initial matter, the Court rejects Defendants' assertion that "ESB-MH (Emigrant's predecessor) transferred the Pinti Note and Pinti Mortgage to FHLBNY in April 2008" when the Pledge Agreement was executed.  Id.  It is undisputed that the Pinti Note and Mortgage were not transferred from EMC to ESB-MH until November 30, 2009.  D. 45-5 ¶¶ 6, 61; D. 117 ¶¶ 75; see D. 45-2 at 217–18; Pinti II, D. 110 at 6, 13–14.  ESB-MH did not own the Pinti Note and Mortgage prior to that date and could not have transferred any interest in those instruments to FHLBNY.  See Culhane v. Aurora Loan Servs. of Neb., 708 F.3d 282, 291 (1st Cir. 2013).

Several months after receiving the August 4, 2009 Category Change Letter, Emigrant endorsed the Pinti Note in blank.  D. 117 ¶ 107.  As a result of this endorsement, the Pinti Note is held by whichever entity possessed it.  Mass. Gen. L. c, 106, § 3-205(b) (providing that instrument "indorsed in blank . . . may be negotiated by transfer of possession alone"); see Deutsche Bank

Nat. Tr. Co. v. Lefebvre, 90 Mass. App. Ct. 1104, 2016 WL 4536285, at *2-3 (2016) (unpublished decision) (ruling that bank that possessed endorsed-in-blank note was owner).  Despite being granted the opportunity on remand to conduct additional discovery into the matter, Defendants have not adduced any evidence controverting that the authentic Note is in Emigrant's possession. See D. 45-5 ¶ 45.  The undisputed record shows that the Pinti Note has been in Emigrant's possession (via its counsel) since the start of this litigation.  D. 118 ¶¶ 9–11; D. 112-8 at 6.  Thus Emigrant is the holder and owner of the Pinti Note.

Defendants make various arguments about the transfer of the Pinti Note based on the rights of FHLBNY and obligations of ESB-MH and Emigrant Bank under the terms of the Advances Agreement, Pledge Agreement and Products Guide which required, *inter alia*, the documents protecting FHLBNY's security interest to be marked as assigned to FHLBNY, kept in a "segregated area" and gave FHLBNY the contractual right to take physical possession of the Pinti Note.  D. 117 ¶¶ 82, 92, 102–03, 107–08.  While these contractual rights and obligations are unambiguous, the undisputed evidence in the record shows that FHLBNY never took physical possession of the Pinti Note.  D. 112-2 at 24 (testifying that Pinti Note was in ESB-MH's vault); D. 112-4 at 37 (testifying that FHLBNY never removed "the Pinti collateral from the Emigrant vault or the Emigrant offices in general").  The evidence also indicates that although ESB-MH was taking steps to comply with the requirements of Listing & Segregation II, ESB-MH never in fact met those requirements because it ultimately decided not to follow-through with the project.  D. 112-4 at 14–15, 22–23; D. 112-6 at 18; D. 112-7 at 13; D. 112-12; D. 112-13; D. 118 ¶ 13.  Even if the Court inferred in Defendants' favor that at some point the Pinti Note was transferred to FHLBNY as part of the Pledge Agreement or Advances Agreement, this would not negate the fact

that the Note is endorsed in blank and has been in the physical possession of Emigrant's agent since before Emigrant initiated this litigation.  D. 118 ¶¶ 9–11; D. 112-8 at 6; see D. 45-5 ¶ 45.

As to the Pinti Mortgage, the parties dispute whether the FHLBNY Assignment was delivered in 2009, as collateral under the Pledge Agreement, or in 2019, as part of Emigrant's attempts to clarify its chain of title prior to filing the present lawsuit.  D. 110 at 10 (arguing that assignment was delivered on November 30, 2009 based on the "plain language of the Advances Agreement and the Pledge Agreement, coupled with the August 4, 2009 letter and Member Product Guide"); D. 116 at 5 (asserting that FHLBNY assignment was delivered on June 4, 2019 (citing D. 112-4 at 36)); D. 117 ¶ 97 (arguing that Pinti loan was 'more than 60 days delinquent as of November 2009" and thus  "no longer eligible to be pledged as collateral" pursuant to Member Products Guide).   For the purposes of the present motion, the Court assumes, without deciding, in Defendants' favor, that before the Discharge was issued, ESB-MH transferred the Pinti Mortgage to FHLBNY.  See D. 110 at 10.  Even with this assumption, if the Emigrant Assignment executed by FHLBNY on June 24, 2019 was effective, then regardless of when the Pinti Mortgage previously was assigned to FHLBNY, Emigrant became the mortgage holder prior to initiating this litigation.

Despite the opportunity for discovery on remand, Defendants adduced no evidence as to the 2019 Emigrant Assignment and continue to argue that the assignment was void because the Discharge then left "nothing to assign," D. 110 at 4, D. 45-1 at 4, an argument the Court previously rejected, D. 61 at 10.   Emigrant contends that its status as a noteholder is sufficient to establish standing to strike the mistaken discharge.  D. 116 at 2–3 (citing Pinti II, D. 121 at 7 (stating that "[i]t appears that the noteholder . . . could in that case, or another, again seek to strike the allegedly mistaken discharge of the mortgage")).   That is, that it has a personal stake in striking the Discharge

so that it can enforce its rights under the Pinti Note.  See Baker v. Carr, 369 U.S. 186, 204 (1962); Mass. Ass'n of Indep. Ins. Agents & Brokers, Inc. v. Comm'r of Ins., 373 Mass. 290, 292 (1977).

In Gleason v. Dorney, the Supreme Judicial Court ("SJC") held that discharge of a mortgage "extinguished" the mortgage and a subsequent assignment "was a nullity, for the bank at that time had nothing to assign."  Gleason v. Dorney, 332 Mass. 646, 648 (1955).  The SJC acknowledged, however, the line of Massachusetts cases wherein "equity will set aside" a discharge made by mistake and emphasized that there were "no findings of mistake or of any other facts that would entitle the [bank] to equitable relief" in that case.  Id.  That is, although a discharge typically extinguishes the mortgage, where the discharge was made by mistake, the former mortgage-holder is not stripped of standing to seek equitable relief striking the discharge.  While no Massachusetts case explicitly states that ownership of the note alone establishes standing to strike a discharge, at least one Massachusetts court has allowed the party who holds the note and a post-discharge assignment of mortgage to strike a discharge erroneously issued by its predecessor.  U.S. Bank Nat'l Ass'n v. Twomey, No. MICV200905070F, 2012 WL 2335295, at *1, 4–5 (Mass. Super. May 23, 2012), aff'd, 83 Mass. App. Ct. 1130 (2013) (granting U.S. Bank's request that discharge recorded on January 26, 2006 be stricken, where U.S. Bank possessed original promissory note endorsed in blank but did not receive formal assignment of mortgage until December 17, 2009).

The Court concludes that as the bearer of the Pinti Note and the assignee of the 2019 Emigrant Assignment, Emigrant has standing to seek cancellation of the allegedly erroneous Discharge.

### C.     <u>Emigrant Has Established That the Mortgage Was Discharged in Error</u>

"It is the general rule that, where a mortgage has been discharged by mistake, equity will set the discharge aside and reinstate the mortgage to the position the parties intended it to occupy, where the rights of intervening lienors have not been affected." <u>North Easton Co-op. Bank v. MacLean</u>, 300 Mass. 285, 292 (1938); <u>see</u> <u>Provident Coop. Bank v. James Talcott, Inc</u>., 358 Mass. 180, 189-90 (1970); <u>E. Bos. Sav. Bank v. Ogan</u>, 428 Mass. 327, 329–32 (1998). Mistakes include misunderstandings of the facts surrounding the transaction at issue as well as administrative and clerical errors. <u>See</u> <u>James Talcott, Inc.</u>, 358 Mass. at 183, 189 (affirming that mortgage was discharged by mistake where lender's attorney failed to discover intervening lien during title search); <u>Wells Fargo Home Mortg., Inc. v. Foley</u>, No. 298686(CWT), 2007 WL 2285809, at *3 (Mass. Land Ct. Aug. 10, 2007) (striking discharge entered by Wells Fargo due to "administrative mistake").

Here, the record establishes that the Discharge occurred due to an administrative error. Defendants do not assert that their mortgage loan was somehow paid off or that there was some other basis for the Discharge. <u>See</u> D. 45-5 ¶ 42; D. 112-1 ¶ 4; D. 117 ¶ 71; <u>Foley</u>, 2007 WL 2285809, at *3 (reinstating mortgage that had not been paid off where no intervening lienor would be prejudiced). As evidence of how the mistake occurred, Emigrant provides a sworn affidavit from Marcano averring that "EMC inadvertently prepared a discharge of the Pinti Mortgage" because EMC's September 18, 2012 memorandum "failed to properly inform Minier that a Discharge of Mortgage should not be prepared and sent to the Defendants." D. 31 ¶¶ 25–27. Marcano further avers that EMC has a policy of instructing its loan servicing department not to prepare a discharge following a third-party foreclosure sale. D. 31 ¶ 18.

Defendants argue that Marcano lacked personal knowledge for his testimony, that he testified as to Emigrant's policies and procedures despite being EMC's deponent and employee and that any statements made regarding EMC's policies and procedures are inadmissible hearsay because he did not attach them to his affidavit.  D. 110 at 12–14; <u>see</u> D. 45-5 ¶ 25 (disputing that the Discharge was a mistake on basis that Marcano was "merely speculating" that the "discharge was made in error" and arguing that Marcano's affidavit is "self-serving hearsay" and relies on no business records prepared prior to the September 18, 2012 memorandum).

"A party's own affidavit, containing relevant information of which he has first-hand knowledge, may be self-serving, but it is nonetheless competent to support or defeat summary judgment." <u>Cadle Co. v. Hayes</u>, 116 F.3d 957, 961 n. 5 (1st Cir. 1997); <u>see Hays v. Jefferson Capital Systems, LLC</u>, No. 15-cv-14025-GAO, 2017 WL 449590, at *2 (D. Mass. Feb. 2, 2017) (citing <u>Wallace Motor Sales, Inc. v. Am. Motors Sales Corp.</u>, 780 F.2d 1049, 1061 (1st Cir. 1985); and <u>Schwartz v. CACH, LLC</u>, No. 13-12644-FDS, 2014 WL 298107, at *2 n.2 (D. Mass. Jan. 27, 2014) (considering affidavit where affiant had custodial responsibilities and personal knowledge regarding business records)).

Here, Marcano avers that his affidavit is made based on his "personal knowledge" and "upon review of the servicing records for the subject property, which records were made and maintained in the regular or ordinary course of business of EMC."  D. 31 ¶ 3.  Defendants argue that Marcano cannot attest to "EMC's established loan servicing policies and procedures" without attaching any record of the same to the affidavit.  D. 110 at 12; D. 31 ¶ 18.  Marcano's affidavit makes clear that he is relying upon his personal knowledge and observations of EMC's policies and practices in his role as Assistant Treasurer in the foreclosure department since 2007.  D. 31 ¶¶ 1, 3; D. 45-2 at 171.

18

The Court also disagrees with Defendants' contention that Marcano lacked personal knowledge to aver that Emigrant, rather than his employer EMC, never "had a policy or preparing or otherwise providing a Discharge of Mortgage to a borrower upon receiving proceeds from a third-party purchaser following a foreclosure sale." D. 110 at 13–14; D. 31 ¶ 19. Under the terms of a subservicing agreement with Emigrant's predecessor-in-interest, EMC acted as Emigrant's servicer "on a group of loans," a role that includes preparing payoff documents. See D. 45-2 at 435–36; id. at 171. As an employee within EMC's foreclosure department, there is no basis here to question that Marcano would be aware if Emigrant routinely issued discharges for foreclosed loans, at least as to the group of loans serviced by EMC. Moreover, the Defendants offer no evidence that Emigrant or ESB-MH would have intentionally directed the loan be discharged and no reasonable jury could find such intent where the Discharge contradicted the financial interests of EMC and Emigrant. See Progressive Consumers, 79 F.3d at 1237.

Finally, Defendants point to a statement by Marcano in his deposition, "I believe [the Discharge] was created in error" for the proposition that Marcano lacked personal knowledge of the error. D. 110 at 12 (citing D. 45-2 at 735). Marcano's subsequent testimony shows that he based his belief upon review of a "memo that was provided along with the check to send to our Payoff Department for processing." D. 45-2 at 735. The Payoff Memo from Sorvillo to Minier, along with other documents related to the attempted foreclosure and discharge, was attached to Marcano's affidavit as business records. D. 31; see Facey v. Dickhaut, 91 F. Supp. 3d 12, 20–21 (D. Mass. 2014) (ruling that affidavit could survive motion to strike "even when the declarant did not personally experience the matters discussed in the affidavit, but did review business or public records and included information from those records with the affidavit"). The Court will, therefore, rely upon Marcano's sworn statement to conclude that the Discharge was in error. See

<u>Cremaldi v. Wells Fargo Bank</u>, No. 13-11767-MLW, 2017 WL 1190377, at *3 (D. Mass. Mar. 30, 2017) (finding sufficient foundation at summary judgment stage when affiant asserted that she was "familiar with the business records maintained by Wells Fargo for the purpose of servicing mortgage loans and [has] personal knowledge of the operations and the circumstances surrounding the preparation, maintenance and retrieval of records in Wells Fargo's recordkeeping systems" (alteration in original)).

Defendants further argue that Sorvillo's deposition testimony creates a factual dispute as to whether the Discharge was in error. D. 45-1 at 18; D. 45-5 ¶ 22; D. 110 at 14. First, Defendants argue that "Sorvillo testified that she did not believe that she made a mistake in preparing the memorandum that would have caused a discharge to be accidentally made." D. 110 at 14 (citing D. 45-2 at 684). As noted in the Court's prior decision, Sorvillo's subjective belief or intentions, however, are not at issue here, but rather the objective indications of corporate actors. D. 61 at 12. Moreover, Defendants misleadingly cite to a portion of Sorvillo's deposition testimony discussing a mistake concerning an unrelated August 2012 memorandum, rather than the September 2012 Payoff Memo. D. 45-2 at 683–86 (testifying as to potential errors that occurred in August when Sorvillo "did an REO acquisition" instead of a third-party sale); <u>id.</u> 709–12 (explaining that memorandum in August relating to REO acquisition was separate from September 18 memorandum to servicing department). With regard to the September Payoff Memo, Sorvillo testified that the person receiving the Payoff Memo could misunderstand the word "payoff" to mean an "actual payoff" or "full payoff," thus leading to an erroneous discharge. D. 45-2 at 714–16; see <u>id.</u> at 690 (testifying that "full payoff" would lead to discharge of a mortgage). Whether Sorvillo, or some recipient of the Payoff Memo, personally accepts blame for the mistake is irrelevant.

Second, Defendants argue that Sorvillo did not "recall[] any policies in place at EMC in 2012 regarding the preparation of such memoranda."  D. 110 at 14 (citing D. 45-2 at 694).  Defendants' characterization of the record untenable.  As Emigrant points out, "Sorvillo testified that she 'wouldn't call them policies. Procedure or something, yes.'"  D. 116 at 16 (citing D. 45-2 at 694).

The Court concludes that Emigrant's continued possession of the unreleased Pinti Note is further evidence that the discharge was unintentional.  Defendants do not dispute that neither EMC nor Emigrant have returned the Pinti Note cancelled or otherwise to Defendants.  D. 45-5 ¶ 28.  Nor do Defendants dispute that EMC has not otherwise marked the Pinti Note as satisfied.  D. 31 ¶ 27; see D. 45-5 ¶ 27.   The return of the Pinti Note may not be a "prerequisite for a valid discharge of the Pinti Mortgage."  See D. 110 at 15.  Cancellation of the mortgage note, however, typically accompanies discharge of a mortgage.  Cf. NationsBanc Mortg. Corp. v. Eisenhauer, 49 Mass. App. Ct. 727, 732 (2000) (affirming district judge's finding that discharge was not erroneous where mortgagors received cancelled note along with discharge and explaining that debtor's possession of cancelled note creates rebuttable presumption of discharge); Dickman v. McClellan, 302 Mass. 87, 88 (1939) (ruling that discharge of mortgage should be reformed to explicitly release liability on note).   At the very least, the non-cancellation of the Pinti Note is further evidence that the Discharge was issued through inadvertence rather than intent.

Defendants, with no supporting case law, argue that even if there was a mistake made, it was a unilateral mistake and thus Emigrant's remedy should be against EMC because EMC made the mistake.  D. 45-1 at 12.  While some Massachusetts cases refer to reformation of the mortgage contract based on the parties' mutual mistake, Massachusetts cases contemplate reinstating discharged mortgages even where there is no apparent fault or mistake on the part of the mortgagor.

Foley, 2007 WL 2285809, at *3 (striking discharge and recognizing that discharge was part of series of "obvious and repeated clerical and administrative errors on the part of Wells Fargo"); see United Fruit Co. v. United States, 186 F.2d 890, 895–96 (1st Cir. 1951) (holding that recission of mistakenly executed release "will not be denied . . . merely because the [plaintiff's] unilateral mistake may have been attributable in some sense to lack of care or diligence" where defendant never "changed its position in reliance on the release").

Defendants also argue that Emigrant is not entitled to a remedy because EMC's mistake was based on a "business decision" to act without retaining a Massachusetts attorney to advise it or hire a compliance officer for Massachusetts. D. 45-1 at 16-17. Even if Defendants had provided any legal support for this argument, id., the factual record does not indicate that the Discharge occurred due to any failure to comply with Massachusetts law, rather than simply misreading or mis-drafting of the Payoff Memo. D. 31 ¶¶ 25-27; D. 45-2 at 714–16.

No reasonable jury could find that EMC intentionally discharged the Pinti Mortgage on the uncontroverted record recited here. D. 31 ¶¶ 25–27; D. 45-2 at 714–16; D. 117 ¶ 119–20. Accordingly, the Court concludes, on an undisputed record, that the Discharge was issued by mistake.[1]

### D.    Emigrant Is Entitled to Recovery in Equity

Defendants argue that even if the Pinti Mortgage was discharged by mistake, Emigrant is not entitled to equity where (1) it acted with unclean hands and (2) Defendants cannot be restored to their *status quo ante* position. D. 110 at 18–21.

---

[1] Defendants' argument regarding unjust enrichment, D. 45-1 at 13, does not warrant a different conclusion. Emigrant has not brought a claim for unjust enrichment and notes that it "merely relies upon Defendants' unjust enrichment as evidence that the discharge of [the Pinti Mortgage] was recorded by mistake, and is not seeking money damages under an independent state law claim for unjust enrichment." D. 46 at 9.

*1.      Emigrant Did Not Act with Unclean Hands*

"The doctrine of unclean hands denies equitable relief 'to one tainted with the inequitableness or bad faith relative to the matter in which [he] seeks relief.'" Murphy v. Wachovia Bank of Del., N.A., 88 Mass. App. Ct. 9, 15 (2015) (quoting Fidelity Mgmt. & Rsch Co. v. Ostrander, 40 Mass. App. Ct. 195, 200 (1996)).  The doctrine "only applies when the claimant's misconduct is directly related to the merits of the controversy between the parties." Travers v. Flight Servs. & Sys., Inc., 808 F.3d 525, 538 (1st Cir. 2015).  "Its purpose is to prevent a party from benefiting by his dishonesty." Fisher v. Fisher, 349 Mass. 675, 677 (1965).  As such, it typically applies where a party engages in "willful misconduct" rather than "an inadvertent act or misapprehension of legal rights."  30A C.J.S. Equity § 118 (2023); see, e.g., Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co., 324 U.S. 806, 815 (1945) (explaining that "[a]ny willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation of" the unclean hands doctrine); Williams v. Arndt, 626 F. Supp. 571, 578 (D. Mass. 1985) (holding that unclean hands defense did not apply to copyright infringement claim where defendants could not "prove that any omission [in copyright application] was an intentional, knowing or purposeful concealment").

In their initial opposition, Defendants contend that "EMC acted with unclean hands when it told Defendants that they were the mortgage holder."  D. 45-1 at 10.  Defendants point to no evidence that EMC did not believe in good faith that it was the "holder and servicer of the loan" when it prepared its August 22, 2011 QWR Response, D. 45-2 at 311, or when it continued to litigate Pinti II.  Defendants also argue that Emigrant "cloud[ed] Defendants title by executing new assignments of a discharged mortgage" to manufacture standing and to deny discovery to Defendants.  D. 45-1 at 11.  Again, despite being accorded discovery regarding the 2019

assignments, Defendants have adduced no evidence that the assignments were fictitious.   The Court does not doubt, and indeed Emigrant does not contest, that the Emigrant Assignment was executed to bolster Emigrant's standing for this and future litigations, but it is unclear why this motive would amount to bad faith misconduct.   See D. 117 ¶ 143 (acknowledging that "Emigrant delivered the FHLBNY Assignment and sought a further Assignment of Mortgage from FHLBNY back to itself to address the Defendants' anticipated challenges to its standing in the context of the FHLBNY Assignment had the instrument been left unrecorded").

Defendants' supplemental opposition asserts that "EMC's preparation of the discharge might not in these circumstances have been a mere negligent mistake but rather, 'reckless, deliberate, unprofessional, incompetent, and possibly misfeasant.'" D. 110 at 19.   General observations about "EMC's shoddy business practices" do not, at this summary judgment stage, answer the merits of the relief that Emigrant seeks here.   D. 110 at 19; see Murphy, 88 Mass. App. Ct. at 16 (rejecting unclean hands defense where plaintiff's failure to disclose his interest in surplus funds was "unconnected" to his claim that Bank erroneously distributed funds).   Defendants fail to offer any evidence regarding recklessness, much less intentional misconduct, with regard to the Discharge.

First, to the extent that EMC's knowledge of its own mistake and failure to act on that knowledge in a timely manner would indicate bad faith, see D. 110 at 19, this case is distinguishable from Nat'l Lumber. There, the court denied equitable subrogation on summary judgment because evidence showed that the bank's attorney became aware of the junior lien before closing on refinancing, intended to seek a discharge or subordination from junior lienholder to ensure seniority of the refinanced mortgage, but for unknown reasons did not actually obtain the discharge or subordination.  Nat'l Lumber Co., 76 Mass. App. Ct. at 3, 7; cf. James Talcott, Inc.,

358 Mass. at 183 (granting equitable relief where attorney did not discover intervening lien during title search).  By contrast, here, Defendants have adduced no evidence that EMC became aware of the potential mistake in time to avert it.  Indeed, two representatives of EMC testified to their lack of knowledge regarding the mistaken Discharge.  D. 45-2 at 155, 252-53 (testifying that as vice president of loan administration, "didn't even know it existed"); D. 45-2 at 610 (testifying that as senior vice president and general counsel of Emigrant Savings Bank, could not recall being told about a mistakenly discharged note).

Second, Defendants argue the Court has not considered the "apparent thousands . . . of mortgage assignments that . . . have never, apparently, been accurately reflected in the recordings by EMC."  D. 110 at 19; see D. 117 ¶¶ 149–151 (describing destruction of some portion of mortgage assignments prepared in late 2009).  Even if the Court were to credit Defendants' position that "thousands" of mortgage assignments were prepared and left unrecorded for a bad-faith purpose, this would have no bearing on the merits of the equitable claim at issue, namely whether the Discharge may be stricken as issued by mistake.

Moreover, barring equitable relief in this case would not serve the doctrine's usual purpose of preventing a dishonest actor from benefiting from its own misconduct.  See Fisher, 349 Mass. at 677.  Here, the Discharge did not benefit Emigrant, but rather delayed its ability to foreclose on the Property and enforce its rights under the Pinti Note pending the resolution of Pinti II and the present matter.  Striking the Discharge will not convert those losses into a windfall.  For all of these reasons, the Court concludes that EMC did not act with unclean hands with regard to the Discharge.

2. *Defendants Restored to Their Pre-Discharge Position*

Defendants argue that rescinding the Discharge is inappropriate where Defendants cannot be restored to their original, pre-Discharge position. D. 110 at 20. Defendants list the following expenses, which they assert exceed the amount owed under the Pinti Note, as evidence of their changed position: (1) attorneys' fees "in excess of $150,000" across "three separate cases;" (2) condo fees paid after the Discharge; (3) entry into a "settlement with their condo association based on the mortgage having been discharged" and (4) use and occupancy payments to Wilion, the foreclosure buyer, and attorney's fees in connection to their dispute with Wilion. Id.

Massachusetts law does not preclude recission even where restoration of the status quo is not feasible. Levy v. Bendetson, 6 Mass. App. Ct. 558, 565 (1978) (ruling that recission of property sale was appropriate even though property had since been resold to another buyer where trial court could "exercise[e] its equitable powers to impose conditions on the grant of relief . . . and fashion a remedy which will be fair to [seller] in the circumstances"). This Court may tailor its award of equitable relief based on the facts of a given case. See, e.g., Francis v. Pinault, No. CIV.A. C96-00625, 1997 WL 414970, at *5–6 (Mass. Super. July 18, 1997) (cancelling mortgage discharge but crediting defendant-mortgagor with $1800 in financing costs incurred to pay off loan and forgiving half the interest that would have accrued while discharge was recorded), vacated on other grounds, 50 Mass. App. Ct. 1109 (2000) (affirming trial judge's reasoning but vacating due to mathematical error); Bank of Mass. v. Cassin, No. 185782, 1994 WL 16193971, at *3 (Mass. Land Ct. Jan. 18, 1994) (granting equitable relief from mistaken discharge by restoring plaintiff to intended position as holder of first mortgage, except as to intervening lienholder who recorded its interest without notice of plaintiff's position).

Here, the Court's remedy returns Defendants to the position they would have occupied if the Discharge had not occurred. Defendants' bases for arguing that their position is irreversibly changed relate to financial liability Defendants incurred while living at the Property. See D. 110 at 20. Prior to execution of the Discharge on October 3, 2012, however, Defendants were already in default on their loan and the Property had already been sold to Wilion. D. 45-5 ¶¶ 14-16; 19; D. 117 ¶¶ 118, 120; see D. 31-1 at 99–100. Moreover, the Discharge was not at issue in Pinti I as Defendants had not discovered it until after the SJC issued its ruling. D. 45-3 ¶ 16; D. 112-1 ¶¶ 22–23. Thus Defendants may be restored to their pre-Discharge position without accounting for payments related to Wilion or related to the state court litigation, as those expenses would have been incurred regardless of the Discharge. D. 116 at 20.

As to attorneys' fees arising from this litigation and Pinti II, Defendant has not identified any case granting reimbursement of attorneys' fees expended defending against recission or striking a mistaken discharge. Simply put, such litigation expenses do not appear necessary to restore Defendants to their pre-Discharge positions. See Less v. Berkshire Hous. Ser., No. 00-30033-MAP, 2000 WL 1615740, at *7 (D. Mass. Sept. 8, 2000) (declining to shift attorney's fees in absence of bad faith in pursuing litigation). Moreover, as Emigrant points out, D. 116 at 20, Defendants provide no documentation from which the Court can determine how much Defendants expended to defend the Discharge, rather than any of the numerous other disputes between the parties.

The Court understands Defendants' position regarding the condo fees and settlement to be that Defendants would not have agreed to pay such fees but for their belief that the Mortgage had been discharged. While Defendants may have sought to avoid paying condo fees for a Property they anticipated being evicted from, Defendants do not explain why liability for such fees would

not have been incurred but for the Discharge.  As Emigrant points out, the litigation between Defendants and the condo association was initiated in January 2010, well before the Discharge was executed, over fees that likely predated the Discharge and which Defendants conceded were owed to the condo association.  D. 116 at 19–20 (citing D. 45-3 ¶ 27).  Fairness does not require the Court to credit Defendants for paying any amount that was already owed to the condo association prior to the Discharge.

Accordingly, the Court finds that Defendants have not shown they cannot be restored to their original positions and will enter a judgment striking the Discharge.

### E.    Defendants Adduced No Evidence of Fraud on the Court

"A 'fraud on the court' occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability to impartially adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense."  Aoude v. Mobil Oil Corporation, 892 F.2d 1115, 1118 (1st Cir. 1989).  Defendants must surmount a "high bar" to obtain relief for fraud upon the court.  United States v. 6 Fox St., 480 F.3d 38, 46 (1st Cir. 2007). "[T]he power of a court to set aside a judgment for fraud upon the court . . . [is a] traditional inherent power of a court to protect its own essential functioning and integrity.  It is, however, a power rarely to be used."  Simon v. Navon, 116 F.3d 1, 6 (1st Cir. 1997).  A finding of fraud upon the court "may be justified only by the most egregious misconduct directed to the court itself, and . . . it must be supported by clear, unequivocal and convincing evidence."  United States v. Yeje-Cabrera, 430 F.3d 1, 28 n.22 (1st Cir. 2005) (internal citation and quotation marks omitted).

Defendants assert that EMC perpetrated a fraud on the Court because (1) in Pinti I and Pinti II, EMC argued that it was the true holder of the Pinti Mortgage and had standing to foreclose,

despite knowing it was merely servicing that mortgage; (2) assignment of the discharged Pinti Mortgage is fictitious; (3) EMC's litigation counsel falsely swore that EMC had standing to foreclose in an affidavit filed in <u>Pinti II</u> and (4) EMC's in-house counsel manipulated or withheld her client's corporate tax records.  D. 45-1 at 6–7.  First, to the extent that that EMC argued in prior litigations that it had standing to strike the Discharge or foreclose on the Property, "[c]hanging legal or factual positions in different cases . . . falls significantly short of committing a fraud on the court."  <u>Lu v. Menino</u>, 98 F. Supp. 3d 85, 99 n.12 (D. Mass. 2015).  Moreover, EMC never denied being the servicer of the loan in <u>Pinti II</u>.  Instead, EMC argued that, as the servicer, it was authorized to act on behalf of Emigrant, the holder of the Pinti Note.  <u>Pinti II</u>, D. 12 at 7.  As to the Pinti Note and 2019 Pinti Mortgage assignments, Defendants offer no evidence of fraud relating to the authenticity of these documents despite the opportunity to conduct discovery on these issues.  Nor have Defendants ever introduced evidence showing the Emigrant or EMC (or their counsel) manipulated or withheld their corporate tax records.  For all of these reasons, Defendants have failed to adduce any evidence that would meet the high burden that is necessary to establish that EMC, Emigrant or their attorneys have committed fraud on the Court.

## F.    <u>Defendants' Counterclaim for Violation of Chapter 93A Is Barred by the Statute of Limitations</u>

In their counterclaim, Defendants allege that Emigrant engaged in unfair and deceptive practices by repeatedly attempting to seize the Property and by sending fraudulent mailings, including notices of Servicemembers Civil Relief Act in Massachusetts Land Court and notices of intent to auction the Property in violation of Chapter 93A.  D. 20 at 10.  Nothing in Defendants' supplemental opposition indicates that the Court should reconsider its prior conclusion that this claim is time-barred.  D. 61 at 16.

Defendants' Chapter 93A counterclaim is governed by a four-year statute of limitations. Mass. Gen. L. c. 260, § 5A. Under Massachusetts law, "[t]he limitations period begins to run 'when a [party] discovers, or any earlier date when she should reasonably have discovered, that she has been harmed or may have been harmed by the defendant's conduct.'" Epstein v. C.R. Bard, Inc., 460 F.3d 183, 187 (1st Cir. 2006) (quoting Bowen v. Eli Lilly & Co., 408 Mass. 204, 205–06 (1990)). Under the discovery rule, "the limitations period is tolled until 'events occur or facts surface which would cause a reasonably prudent person to become aware that she or he had been harmed.'" Epstein, 460 F.3d at 187 (quoting Felton v. Labor Rels. Comm'n, 33 Mass. App. Ct. 926, 927 (1992)). This discovery must include two components: "not only knowledge that one has been injured but knowledge of its cause—that [the party] 'has been harmed as a result of the defendant's conduct.'" Fidler v. Eastman Kodak Co., 714 F.2d 192, 198 (1st Cir. 1983) (quoting Olsen v. Bell Tel. Labs., Inc., 388 Mass. 171, 175 (1983)).

Here, Defendants reasonably knew as on August 9, 2012, the date of the attempted foreclosure sale, of the conduct that it alleges violates Chapter 93A. D. 20 at 10; D. 45-5 ¶¶ 14–16. Thus, Defendants' claim expired four years later, on August 9, 2016. Defendants did not assert their claim for violations of Chapter 93A until May 18, 2020, see D. 20, thus the statute of limitations bars their claim.

Defendants argue that in equity it would be "unfair to allow [Emigrant] to delay in bringing the action, to prevent meritorious claims, that were held back because of the discharge." D. 45-1 at 15. The Court, however, does not conclude that Emigrant's claim was delayed unreasonably when it was brought within the requisite statute of limitations period. See Petrella v. Metro-Goldwyn-Mayer, Inc., 572 U.S. 663, 679 (2014) (holding that laches cannot defeat a claim brought within the period prescribed by statute of limitations). "An action for the recovery of land shall

commence . . . within twenty years after the right of action . . . first accrue[s]." Mass. Gen. L. c. 260 § 21.  Defendants recorded the discharge of the Pinti Mortgage on July 29, 2015.  D. 45-5 ¶ 38.  Thus the statute of limitations for any claim regarding same by Emigrant expires twenty years from July 29, 2015.  Given that Emigrant brought its claim within the requisite statute of limitations, D. 1, the Court cannot conclude that Emigrant unreasonably delayed in bringing its action.

To the extent that Defendants argue that because Emigrant's claim has a longer statute of limitations period, the Court should equitably toll the statute of limitation for Defendants' Chapter 93A claims, they, again, do not cite any case law for this position.  Moreover, case law stresses that "equitable tolling is proper only when [a party] has in some extraordinary way . . . been prevented from asserting his or her rights."  Mosso v. Matesanz, No. 00-10199-GAO, 2001 WL 1688900, at *1 (Dec. 5, 2001) (internal citation and quotation marks omitted).  Defendants have not explained why any alleged delay on the part of Emigrant to file its claim prevented Defendants from bringing for their own Chapter 93A claim.  Indeed, the June 17, 2016 Pinti II complaint made clear that EMC intended to seek cancellation of the Discharge and yet Defendants did not raise their Chapter 93A claims until nearly four years later.  Pinti II, D. 1 ¶¶ 37–42.  Thus, the Court will not equitably toll the statute of limitations for Defendants' counterclaim and their Chapter 93A counterclaim is time barred.[2]

### G.    Defendants' Counterclaim for Negligent Infliction of Emotional Distress Fails

Defendants assert that Emigrant negligently inflicted emotional distress when it failed to have EMC "confirm that it had the authority to attempt to foreclose, and this negligence is the

---

[2] Given this ruling, the Court need not reach Emigrant's arguments on the merits or its argument that Defendants' Chapter 93A claim is barred by *res judicata*.  D. 29 at 11, 13-16.

direct cause of the harm suffered by Linda Pinti." D. 20 at 11. Emigrant asserts that this claim is barred by the doctrine of claim preclusion and fails on the merits. D. 29 at 16–18. First, a claim is precluded under the doctrine of *res judicata* if there is "(1) a final judgment on the merits in an earlier action; (2) sufficient identity between the causes of action asserted in the earlier and later suits; and (3) sufficient identity between the parties in the two suits." Bay State HMO Mgmt., 181 F.3d at 177. Defendants previously asserted a negligent infliction of emotional distress claim in Pinti II premised on EMC's efforts to foreclose the Pinti Mortgage. Pinti II, D. 31-1 ¶¶ 62–68. The Court in Pinti II, entered a final judgment on the merits of this claim when it granted summary judgment in favor of EMC. Pinti II, D. 54 ¶ 3. Second, there is sufficient identity between the causes of action asserted in Pinti II and the current case because both arise out of EMC's conduct in attempting to foreclose the Property. Third, EMC and Emigrant share a sufficient identity because EMC is Emigrant's servicer. See R.G. Fin. Corp. v. Vergara-Nunez, 446 F.3d 178, 185–86 (1st Cir. 2006). Accordingly, EMC and Emigrant are sufficiently identical with regard to Pinti II and the present case, and Defendants' allegations of negligent infliction of emotional distress are barred.

Even if this claim was not barred by *res judicata*, it fails on the merits. To succeed on their counterclaim for negligent infliction of emotional distress, Defendants must demonstrate that Emigrant owed them a duty of care. See Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 239 (1st Cir. 2013). Mortgagor-mortgagee relationships, however, do not give rise to a duty of care. Id. at 239 & n.15 (citing Corcoran v. Saxon Mortg. Servs., Inc., No. 09–11468–NMG, 2010 WL 2106179, at *4 (D. Mass. May 24, 2010)); see MacKenzie v. Flagstar Bank, FSB, 738 F.3d 486, 495 (1st Cir. 2013) (holding that "relationship between a borrower and lender does not give rise to a duty of care under Massachusetts law").

Accordingly, Emigrant is entitled to summary judgment on Defendants' counterclaim for negligent infliction of emotional distress.

### H.   Defendants' Counterclaim Intentional Infliction of Emotional Distress Claim Also Fails

Defendants also assert that Emigrant intentionally inflicted emotional distress by allowing EMC fraudulently to attempt to foreclose on the Property, despite knowing the effect the foreclosure would reasonably have on Pinti.  D. 20 at 11.  Unlike the claim for negligent infliction of emotional distress, Defendants previously did not assert this claim.  "[C]laim preclusion [however,] bars the relitigation of any issue that was, or *might have been*, raised in respect to subject matter of the prior litigation prior litigation."  Grella v. Salem Five Cent Sav. Bank, 42 F.3d 26, 30 (1st Cir. 1994) (emphasis in original) (citations omitted).  Defendants' counterclaim for intentional infliction of emotional distress is premised on similar facts as its negligently infliction of emotional distress claim, namely EMC's conduct in attempting to foreclose on the Property.  This conduct occurred prior to Pinti II and thus Defendants were obligated to bring such a claim in Pinti II.  See Airframe Sys., Inc. v. Raytheon Co., 520 F. Supp. 2d 258, 267 (D. Mass. 2007) (ruling that claim preclusion wiped out liability based on any actions or conduct preceding the court's prior decision).

Even assuming, however, that Defendants' claim for intentional infliction of emotional distress is not precluded, it too fails on the merits.  Under Massachusetts law, a claimant must show the following for a claim of intentional infliction of emotional distress:  "(1) the defendant intended to inflict emotional distress, or knew or should have known that emotional distress was the likely result of his conduct . . . (2) the defendant's conduct was extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community, (3) the actions of the defendant were the cause of the plaintiff's distress, and (4) the emotional distress

suffered by the plaintiff was severe and of such a nature that no reasonable person could be expected to endure it."  Payton v. Abbott Labs, 386 Mass. 540, 555 (1982).  "Liability cannot be predicated on mere insults, indignities, threats, annoyances, petty oppressions or other trivialities[;] nor even is it enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort."  Tetrault v. Mahoney, Hawkes & Goldings, 425 Mass. 456, 466 (1997) (citations and internal quotation marks omitted).  "[W]hile home foreclosure is a terrible event and likely fraught with unique emotions and angst, foreclosures, even ones that may involve improper conduct, do not readily go beyond all possible bounds of decency."  Asfour v. Citizens Bank, N.A., No. 16-11732-FDS, 2016 WL 7428224, at *6 (D. Mass. Dec. 23, 2016) (quoting Payton v. Wells Fargo Bank, N.A., 2013 WL 782601, at *4 (D. Mass. Feb. 28, 2013)).

Here, on this developed record, there is no support for an assertion that Emigrant or EMC acted intentionally to inflict emotional distress or knew or should have known that emotional distress would result.  Accordingly, the Court also allows Emigrant's motion for summary judgment as to Defendants' counterclaim for intentional infliction of emotional distress.

## I.  Defendants' Defense of Laches

"A defense of laches exists upon a factual finding that there has been unjustified, unreasonable, and prejudicial delay in raising a claim."  Santagate v. Tower, 64 Mass. App. Ct. 324, 333 (2005) (citation omitted).  Defendants argue that there is a factual dispute as to why Emigrant waited "from 2012 to the filing of the instant case to assert their rights."  D. 45-1 at 15.  A defense of laches, however, cannot be invoked to bar legal relief in the face of a statute of limitations enacted by Congress.  SCA Hygiene Products Aktiebolag v. First Quality Baby

Products, LLC, 580 U.S. 328, 334–35 (2017).  As discussed above, the statute of limitations for Emigrant's claim is twenty years from July 29, 2015.  That date has not yet passed.  Moreover, given Defendants' recording of the Discharge in 2015, the significant history of litigation between Defendants and Emigrant's affiliates and the Emigrant's filing of the present action after Pinti II, the Court does not find that there was any unreasonable delay in Emigrant's pursuit of its claims.  Thus, the Court does not conclude as a matter of equity or otherwise that Emigrant's claim was delayed unreasonably.  See Petrella, 572 U.S. at 675-81 (holding that laches cannot defeat a claim brought within the period prescribed by statute of limitations).

## VI.    Conclusion

For the foregoing reasons, the Court ALLOWS Defendants' motion for summary judgment, D. 28.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge